**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

COLORQUICK, L.L.C.,

      Plaintiff,

      v.

EASTMAN KODAK COMPANY,

      Defendant.

CIVIL ACTION NO. 6:06-CV-390-LED

**EASTMAN KODAK COMPANY'S
<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

Mark M. Supko (*pro hac vice*)
msupko@crowell.com
David D. Cross (*pro hac vice*)
dcross@crowell.com
**CROWELL & MORING, LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

Jennifer Ainsworth
State Bar No. 00784720
jainsworth@wilsonlawfirm.com
**WILSON, SHEEHY, KNOWLES,
ROBERTSON & CORNELIUS, PC**
One American Center
909 ESE Loop 323, Suite 400
Tyler, Texas 75701
Telephone: (903) 509-5000
Facsimile: (903) 509-5092

*Attorneys for Defendant
Eastman Kodak Company*

Dated:  May 1, 2008

## Table of Contents

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF FACTS ...................................................................................2

        A.      Background of the Technology..............................................................2

        B.      The Patent-in-Suit ................................................................................3

        C.      Prosecution History of the '149 Patent ..................................................4

        D.      The Accused Product ...........................................................................5

III.    LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION ............................6

IV.     PROPER CONSTRUCTION OF THE DISPUTED CLAIM TERMS ..........................8

        A.      "Still Image Proxy"..............................................................................9

        B.      "Image Display".................................................................................10

        C.      "PDL Image File" ..............................................................................11

        D.      "Static Template"...............................................................................12

        E.      "Postscript or PDF File" .....................................................................15

        F.      "Electronically Manipulating an Image Display of the Still Image Proxy" .......15

        G.      "Using the Information About the Manipulations to Revise the PDL Image
                File so as to Match the PDL Image File to the Manipulations Made to the
                Image Display of the Still Image Proxy"...........................................21

V.      CONCLUSION..................................................................................................26

## Table of Authorities

**Cases**

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003) ............. 21

*Embrex, Inc., v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) .................................. 1

*Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ...................................................................... 7

*Grantley* ............................................................................................................................ 16, 22

*Grantley Patent Holdings, Ltd. v. Clear Channel Communications, Inc.*, No. 9:06CV259, 2008
    U.S. Dist. LEXIS 1588, at *12 (E.D. Tex. Jan. 8, 2008) .......................................................... 16

*Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999)............... 22

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006)......................... 18

*Honeywell*, 452 F.3d at 1318 ................................................................................................... 25

*Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)..................................... 7

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517
    U.S. 370 (1996)......................................................................................................................... 6

*Markman*, 52 F.3d at 980 .......................................................................................................... 7

*Northern Telecom Ltd. v. Samsung Co.*, 215 F.3d 1281, 1294-95 (Fed. Cir. 2000)...................... 7

*Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1327-28 (Fed. Cir. 2003) ............................ 7

*Ormco v. Align Technology Inc.*, 498 F.3d 1307 (Fed. Cir. 2007) ............................................. 24

*Ormco*, 498 F.3d at 1312-13 ................................................................................................... 24

*Pause Technology LLC v. TiVo Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) ................................ 2

*Pause Technology*, 419 F.3d at 1331 ...................................................................................... 22

*Phillips* ............................................................................................................................. passim

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) ................................................... 1

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1342-43 (Fed. Cir. 2001)
    ................................................................................................................................................ 7

*SciMed*, 242 F.3d at 1343-44 .................................................................................................. 8

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ................................ 7

*Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ................................ 6

*Vitronics*, 90 F.3d at 1582 .......................................................................................................... 6, 7

Pursuant to Local Patent Rule 4-5(b), Defendant Eastman Kodak Company ("Kodak") submits this brief in response to the Opening Claim Construction Brief filed by Plaintiff Colorquick, L.L.C. ("Colorquick").

I.     **INTRODUCTION**

The claim construction issues in this case reflect a classic dichotomy.  Colorquick, as patentees often do, advocates for broad, generic definitions of individual words in the claims, typically citing only to dictionaries for support.  Kodak, the accused infringer, advocates for somewhat narrower constructions based on how the terms are used in the patent specification and concessions the patentee made during prosecution.  Kodak's approach is the legally correct one.

In its seminal *Phillips* decision, the Federal Circuit instructed district courts that claim construction requires focusing on *the invention*, not just supposed "ordinary meanings" of individual words in a claim:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  *The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.*

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (emphasis added).  Kodak's proposed constructions properly adhere to this guidance.

The purpose of claim construction is to "elaborat[e] the normally terse claim language in order to understand and explain, but not to change, the scope of the claims."  *Embrex, Inc., v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).  The Court's role is not merely to define individual words plucked from a claim, divorced from the context provided by the surrounding words in the claim and the patent specification.  Indeed, even when the meaning of only one word or phrase in a claim element is unclear, it is legal error to construe that single

word or phrase in isolation.  *Pause Tech. LLC v. TiVo Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005).

Colorquick consistently and erroneously urges this Court to define only individual words in the claims, ignoring how those words are actually used in the patent.  The generic, dictionary-based definitions proposed by Colorquick fail to accurately reflect how a person of ordinary skill in the art would understand the disputed claim language when read in view of the specification and prosecution history, and their adoption by this Court would result in a claim scope that far exceeds the alleged invention described in the patent-in-suit.

## II.    <u>STATEMENT OF FACTS</u>

### A.    <u>Background of the Technology</u>

The patent-in-suit, U.S. Patent No. 6,839,149 ("the '149 patent"), generally relates to the printing industry, and in particular is directed to an automated process designed to streamline certain interactions between a customer who has a document to be printed (*e.g.*, an advertisement) and a print shop that will print that document (*e.g.*, in a magazine).  *See* '149 Patent, 1:25-31 (Ex. A).[1]  "Prepress," a multi-stage process for preparing an electronic document for printing, spans the entire workflow from creation of the electronic document to the time ink goes onto paper.  The "preflight" portion of the prepress process involves comparing characteristics of the electronic document, which is typically stored in a page description language (PDL) file, to production requirements established by the print shop (*e.g.*, the permissible size of the document).  *Id.* at 1:38-41.  In a modern digital printing operation, this comparison is performed by a computer program and any errors are flagged in a preflight report

---

[1] Patent citations are in the form a:bb-cc, where "a" is the column number in the specification of the patent, and "bb-cc" is a range of line numbers.

sent to the customer.  *Id.* at 1:33-44.  In a conventional preflight process, the customer would then have to manually correct the PDL file, typically using a proprietary software package (*e.g.*, Adobe Acrobat), and then resubmit the file to the print shop for another preflight check.  *Id.* at 1:54-60.  It was this aspect of the preflight process that Colorquick sought to improve.

**B.**      **The Patent-in-Suit**

The '149 patent, titled "Preparation of Production Data for a Print Job Using a Still Image Proxy of a Page Description Language Image File," was issued by the United States Patent and Trademark Office ("PTO") on January 4, 2005.  Colorquick filed the application that led to the '149 patent on March 21, 2002.  The invention described and claimed in the patent is purported to be an improvement over conventional preflight processes.  '149 Patent at 1:45-61, 2:29-33.

According to the '149 patent, prior art preflight processes were inefficient because whenever a print file failed a preflight inspection, the customer was required to manually correct the file, transmit the corrected file back to the print shop, and then have it subjected to another preflight inspection.  This back-and-forth between the customer and the print shop could go through numerous iterations, since the customer was unable to get immediate feedback regarding whether the corrections to the print file successfully overcame the preflight errors (or whether the corrections created new errors).  *Id.* at 1:45-61, 7:30-34, 7:62-8:10.

To remedy this perceived deficiency in the prior art, the '149 patent describes a computer-implemented tool by which a customer can visually and automatically effect changes to a print file residing at a print shop, eliminating the need for the customer to correct the print file at the customer location and transmit the corrected file to the print shop.  *Id.* at 5:66-6:7.  To accomplish this, when a print file sent to the print shop fails a preflight inspection, the customer is able to access a "still image proxy" of the print file over the Internet.  *Id.* at 6:17-36.  Using a browser-based computer program, the customer is able to "electronically manipulate" the

appearance of the still image proxy in order to correct the preflight errors.  For example, the customer can resize the display of the still image proxy to comply with a size restriction imposed by the print shop.  *Id.* at 6:61-7:30.  The computer program records the customer's manipulations and the recorded manipulations are then automatically applied to the print file maintained by the print shop.  *Id.* at 8:18-35, 44-61.  Through this process, the customer effectively is able to change the electronic document on-the-fly and see exactly how it will appear when printed, all without the need to manually revise print files and transmit them back-and-forth between the customer and the print shop.  *Id.* at 7:30-34 ("An important feature of the present invention is that this process allows the user to view exactly how the ad will appear within the purchased ad space . . . .").

C. **Prosecution History of the '149 Patent**

After Colorquick filed the application for the '149 patent, the PTO issued a "restriction requirement" because, in the patent examiner's view, the application described and claimed three distinct inventions.  Office Action, Nov. 18, 2003, at 2 (Ex. B).[2]  The three inventions identified by the examiner corresponded to what the patent characterizes as the "first," "second" and "third" embodiments."  *Id.*  In general, the first embodiment is the system described above, in which a user electronically manipulates a display of a still image proxy of a PDL file, and the recorded manipulations are used to automatically revise the PDL file.  U.S. Patent Application No. 10/103,510, at p. 5, ln. 3-31 (Ex. C).[3]  The second embodiment is a system that enables the customer to append "production specifications" to the still image proxy to convey instructions to

---

[2] A copy of the entire prosecution history is attached as Exhibit L.

[3] Since the '149 patent had not been issued yet, reference is made to the original application that was before the patent examiner at the time of the restriction requirement.

the print shop, such as the desired location of perforations or hole punches in the final printed document.  *Id.* at p. 6, ln. 1-13.  The third embodiment is a system in which the still image proxy can be manipulated in relation to a specially-formatted template, the size of which is dynamically determined based on the area in which the image must fit when printed.  *Id.* at p. 6, ln. 14 – p. 7, ln. 4.

In response to the restriction requirement, Colorquick elected to prosecute only the claims directed to the first embodiment (*i.e.*, original claims 1-12, 20-31 and 39-50), making the election "without traverse" (*i.e.*, without disputing the correctness of the examiner's position).  Resp. to Restriction Requirement, Dec. 18, 2003, at 2 (Ex. D).   Colorquick later filed a divisional application directed to the second embodiment (*i.e.*, the system for appending production specifications to the still image proxy), which application recently issued as U.S. Patent No. 7,298,516 (Ex. E).  Colorquick has not asserted that patent against Kodak.

### D.      The Accused Product

In this lawsuit, Colorquick has accused Kodak of infringing certain claims of the '149 patent as a result of selling a product called "InSite."  InSite is a software application directed to the "proofing" step of the prepress workflow, which typically occurs only after a print file passes the preflight check (to which the '149 patent is directed) and is considered ready for final review and approval by the customer.  More particularly, InSite facilitates a process called "soft proofing," in which a customer (or group of customers concurrently) is able to access over the Internet an electronic proof of a document to be printed, without the need for the print shop to send a hard-copy proof to the customer as was done in the past.  *See generally* InSite Brochure (Ex. F).  Colorquick's infringement contentions focus on the "annotations" feature of InSite, which allows a customer to communicate change requests to the print shop without having to send a marked-up of the hard-copy proof to the print shop.  *See* InSite 4.2 Customer Quick Start

Guide, 10 (Ex. G).  InSite does not provide users with the ability to change or manipulate the appearance of the electronic proof, nor does it enable users to automatically effect changes to the print file.

InSite has been on sale in the United States since well before Colorquick filed the application for the '149 patent.  The product was originally developed in the late 1990s by Creo Inc., a Canadian company that Kodak acquired in 2005.  Dep. Tr. of A. Mirmotahari, Mar. 12, 2008, at 34:21-22, 35:18-23 (Ex. H).  Creo based the annotations feature of InSite on an even earlier Carmel Graphics product called View-It.  *Id.* at 66:14-21.  Creo acquired Carmel Graphics in the 1999/2000 timeframe and quickly integrated View-It into InSite (which already included a similar annotations feature).  *Id.* at 65:1-7, 66:11-21.  The annotations feature of InSite has been largely unchanged since the integration of View-It.  *Id.* at 132:2-11.

## III.   LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

The claims of a patent define the scope of the protected invention.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Claim construction -- determining the meaning and scope of each claim -- is an issue of law to be decided by the judge.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

The words of a claim "are generally given their ordinary and customary meaning," as viewed from the perspective of a person of ordinary skill in the art at the time of the invention.  *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics*, 90 F.3d at 1582).  In determining the meaning of a disputed claim term, a court should look primarily to the so-called "intrinsic evidence," namely, the claim language, the patent specification, and the prosecution history.  *Phillips*, 415 F.3d at 1312; *Vitronics*, 90 F.3d at 1582.  Among the different sources of intrinsic evidence, however, the specification is "the primary basis for construing the claims."  *Phillips*, 415 F.3d at

1315 (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)).  The

Federal Circuit has explained:

> [T]he specification is always highly relevant to the claim construction analysis.
> Usually, it is dispositive; it is the single best guide to the meaning of a disputed
> term.

*Vitronics*, 90 F.3d at 1582 (cited with approval in *Phillips*, 415 F.3d at 1315).  When the

specification distinguishes the claimed invention over the prior art, the claimed invention should

be interpreted as being so limited.  *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys*., 242

F.3d 1337, 1342-43 (Fed. Cir. 2001).

Patent claims must also be construed in light of the patent's prosecution history.  *Graham

v. John Deere Co.*, 383 U.S. 1, 33 (1966); *Vitronics*, 90 F.3d at 1582-83; *Markman*, 52 F.3d at

980.   The scope of claims can be limited by amendments and arguments made by the applicant

or his representative during prosecution.  *See, e.g., Omega Eng'g Inc. v. Raytek Corp*., 334 F.3d

1314, 1327-28 (Fed. Cir. 2003); *N. Telecom Ltd. v. Samsung Elecs. Co*., 215 F.3d 1281, 1294-95

(Fed. Cir. 2000).

So-called "extrinsic evidence" for claim construction purposes is all evidence external to

the patent and its prosecution history, such as dictionaries and expert witness or inventor

testimony.  *Vitronics*, 90 F.3d at 1583-84; *Markman*, 52 F.3d at 980.  Resort to extrinsic

evidence is improper when the intrinsic evidence removes any ambiguity as to the meaning of

the claim.  *Vitronics*, 90 F.3d at 1583-84.  It is error "to use extrinsic evidence to arrive at a claim

construction that is clearly at odds with the claim construction mandated by the claims

themselves, the written description, and the prosecution history, in other words, with the written

record of the patent."  *Key Pharm. v. Hercon Labs. Corp*., 161 F.3d 709, 716 (Fed. Cir. 1998);

*Vitronics*, 90 F.3d at 1584-85.  By relying on the intrinsic record, courts ensure that a patent

claim is defined only as broadly as what the inventor actually invented.  *Phillips*, 415 F.3d at

1316; *SciMed*, 242 F.3d at 1343-44.

## IV.    PROPER CONSTRUCTION OF THE DISPUTED CLAIM TERMS

Kodak has properly construed the disputed claim terms based on the intrinsic evidence, in

keeping with the methodology set forth by the Federal Circuit in *Phillips*.  ColorQuick, on the

other hand, departs from *Phillips* by largely ignoring the intrinsic evidence and instead relying

on extrinsic dictionary definitions in a transparent attempt to extend the scope of the claims far

beyond anything disclosed in the '149 patent.  Indeed, Colorquick's proposed constructions are

so broad that they encompass not only what the patent itself describes as prior art, but also

subject matter that Colorquick disclaimed during prosecution.

In this infringement action, Colorquick alleges that Kodak has infringed claims 1-3, 11,

25-27 and 35.  Method claim 1 and apparatus claim 25 are the only independent claims asserted.

Claim 1 is representative and reads as follows:

> 1. An automated computer-implemented method of preparing production data
> for a print job, the production data including an electronic document defined by a
> page description language (PDL), the electronic document being stored in a PDL
> image file, the method comprising:
>
> (a) creating a still image proxy of the PDL image file;
>
> (b) electronically manipulating an image display of the still image proxy and
> recording information about the manipulations; and
>
> (c) using the information about the manipulations to revise the PDL image file
> so as to match the PDL image file to the manipulations made to the image display
> of the still image proxy.

'149 Patent at 11:46-59.  Each of the disputed claim terms are discussed below in the order in

which they appear in the claims.

## A.   "Still Image Proxy"

Asserted claims 1, 3 and 25 of the '149 patent recite the step of creating a "still image proxy" of the page description language (PDL) file containing the electronic document to be printed.  The parties' proposed constructions are set forth below.[4]

| Claim Language | Kodak's Construction | Colorquick's Construction |
|---|---|---|
| creating a ***still image proxy*** of the PDL image file | A computer file, such as a JPEG, GIF, PNG, or the like that substitutes for the PDL image file and specifies the appearance of the electronic document when presented on a display screen. | A still substitute image file, which may be a JPEG, GIF, and PNG file, or the like. |

In essence, the issue before the Court is whether the term "still image proxy" should be construed in a manner that describes what it is and does, as Kodak has done, or instead should be construed only in terms of the format of the file in which it is stored, as Colorquick has done.  On the latter point, there appears to be no dispute that the still image proxy can be a JPEG, GIF, PNG, or similar type of bitmap image file.  *See* '149 Patent at 2:42-45.  However, Colorquick effectively stops the claim construction inquiry there, merely replacing the word "proxy" with "substitute" to arrive at its construction.  Colorquick's construction is incomplete.

Consistent with Kodak's construction, the specification of the '149 patent expressly teaches that the still image proxy is a substitute for the electronic document stored in the PDL file.  *Id.* at 6:19-22 ("More specifically, the PDL-defined image is converted into a still image proxy . . . thereby creating a still image proxy representation of the original PDL image.").  Moreover, just as the PDL file specifies what the image will look like when it is printed, the still

---

[4] Kodak's proposed constructions for all of the disputed claim terms were set forth in the Joint Claim Construction Statement filed March 5, 2008.

image proxy specifies what the image will look like when it is presented to the user on a computer display screen.  *Id.* at 6:30-35 ("The still image proxy (here, the JPEG image) is inserted into a browser-compatible program that allows a user to manipulate the JPEG image . . . The inserted image effectively becomes a 'proxy' for the original PDL image.").

While Colorquick characterizes the second half of Kodak's construction as an "unsupported functional limitation," Opening Br. at 6, Colorquick fails to identify anything in the '149 patent that even hints at a different function for the still image proxy.  In fact, during prosecution of the '149 patent, Colorquick explained to the patent examiner, in response to an objection to the disclosure, that:

> The disclosure was further objected to because it was unclear to the Examiner as to whether the still image proxy is referring to images displayed on a screen or to a file containing data.  In response, a file is created that represents the still image. The still image proxy shown in Figs. 8-13 is a <u>display of that file</u>.

Amendment, Mar. 31, 2004, at 19 (Ex. I) (emphasis in original).  Thus, Colorquick itself described the still image proxy in a manner that is fully supportive of Kodak's proposed construction.

## B.  "Image Display"

Asserted claims 1 and 25 recite an "image display" of the still image proxy that is electronically manipulated.  The parties' proposed constructions are below.

| Claim Language | Kodak's Construction | Colorquick's Construction |
|---|---|---|
| electronically manipulating an ***image display*** of the still image proxy and recording information about the manipulations | A visual representation presented on a display screen. | Graphic representation on a screen. |

The parties' disagreement over the meaning of this term is relatively minor.  However, the Court should adopt Kodak's construction because it is rooted in the specification and

prosecution history of the '149 patent, whereas Colorquick's proposed construction is based largely on an extrinsic dictionary definition.  *See Phillips*, 415 F.3d at 1321 ("[I]f the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.").  In the same amendment discussed above, Colorquick explained to the patent examiner that "the user manipulates the display of the file (i.e., the *visual appearance* of the file may be changed by user manipulations.").  Amendment at 19 (Ex. I) (emphasis added).  Likewise, the specification speaks in terms of "presenting" what the user manipulates on a "display screen":

> FIGS. 8-13 show *display screens* of a user interface *presented* at a browser for allowing an electronic file to be manipulated with respect to a template in accordance with one embodiment of the present invention.

'149 Patent at 3:22-25 (emphasis added).

In contrast to Kodak's well-supported construction, Colorquick fails to identify any intrinsic evidence describing the image display as a "graphic representation."[5]  Indeed, it is curious that Colorquick attacks the word "presented" in Kodak's construction as having an uncertain meaning when Colorquick's own patent uses that word to describe how the image is displayed to the user.  *Id.*

## C. "PDL Image File"

Asserted claims 1 and 25 recite that the electronic document to be printed is stored in a "PDL image file."  The parties' proposed constructions are below.

---

[5] Colorquick points to a portion of the '149 patent describing the source code for an implementation of the claimed invention as being "divided into layers to make it easier to manipulate the appearance of graphic elements," but that statement says nothing about the image display being a "graphic representation."  Opening Br. at 7 (citing '149 Patent at 10:48-52).

| Claim Language | Kodak's Construction | Colorquick's Construction |
|---|---|---|
| An automated computer-implemented method of preparing production data for a print job, the production data including an electronic document defined by a page description language (PDL), the electronic document being stored in a **PDL image file** | A computer file containing page description language (PDL) instructions that define the appearance of an electronic document when printed. | A computer file containing page description language (PDL) that specifies [defines] the appearance of an electronic document when printed. |

The constructions set forth in the parties' joint submission to the Court differed in two respects, but Colorquick now appears to agree that page description language "defines" the appearance of an electronic document when printed (as opposed to "specifies," as in its original construction). *See* Opening Br. at 8. Thus, the only remaining difference is whether "PDL image file" should be construed as containing "instructions." A computer language, by its very nature, provides a means for communicating instructions to a computer, and for that reason Kodak's construction is more accurate and should be adopted. Colorquick's construction, by contrast, begs the question "page description language *what?*" (*e.g.*, instructions? words? commands?).

D.     **"Static Template"**

Asserted claims 1 and 25 recite a "static template" that defines a predetermined area, in association with which the still image proxy is displayed.[6] The competing constructions are as follows.

---

[6] Asserted dependent claims 2-3 and 26-27 of the '149 patent refer to "the template" without any proper antecedent basis, but presumably these are references to the "static template" recited in the associated independent claims. Kodak reserves the right to assert that the dependent claims are invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2.

| Claim Language | Kodak's Construction | Colorquick's Construction |
|---|---|---|
| creating a ***static template*** that defines the predetermined area and displaying the image display of the still image proxy in association with the template | A fixed frame presented on the display screen that corresponds to a predetermined area in which the electronic document must fit when printed, and in relation to which the image display of the still image proxy is manipulated. | No construction needed.<br><br>[or]<br><br>A template that defines a predetermined area for an image display of a still image proxy. |

The specification of the '149 patent provides a nearly-express definition of the term

"static template":

> In one example of the first embodiment, the production data comprises a predetermined area in which the electronic document must fit. A static template is dynamically created that defines the predetermined area and the image display of the still image proxy is then displayed in association with the template. In this embodiment, the image display of the still image proxy is electronically manipulated in relation to the template and information about the manipulations is recorded in relation to the template. The template may represent the predetermined area that the electronic document must fit in a layout of a physical printed document.

'149 Patent at 4:1-15. Kodak's proposed construction is directly supported by this express

disclosure in the patent.

Colorquick presents two arguments regarding the "static template." Colorquick first

argues that no construction is necessary because the claim itself supposedly defines the term

sufficiently. Colorquick then argues in the alternative that the term should be construed

substantially more broadly than Kodak has proposed. Ironically, Colorquick's proposed

definition itself refutes the argument that the term is sufficiently defined in the claim.

The preamble of claim 2 recites that "the production data further comprises a

predetermined area in which the electronic document must fit." '149 Patent at 11:60-62. The

claim goes on to recite "creating a static template that defines *the* predetermined area," referring

back to the predetermined area recited in the preamble. Since the "electronic document" recited

in the claim is what is stored in the PDL file for printing, not the still image proxy displayed to the user, piecing together the different parts of the claim suggests that the static template corresponds to the predetermined area in which the electronic document must fit when printed (as in Kodak's construction).  Yet, Colorquick's alternative construction refers to "a predetermined area *for an image display of a still image proxy*."  Opening Br. at 10.  The fact that Colorquick itself could not come up with a construction that is consistent with the entirety of the claim language counsels strongly against leaving the jury to try to figure it out for themselves.

In proposing its alternative construction, Colorquick apparently concedes that it is appropriate to define "static template" in terms of how it is used.  Contrary to Colorquick's inaccurate construction, however, the claims expressly recite that the image display of the still image proxy is electronically manipulated "in relation to the template," just as Kodak specifies in its proposed construction.  *See, e.g.*, '149 Patent at 11:66-12:2.  Kodak's proposed construction is thus fully supported by both the claim language and the specification of the '149 patent.

Colorquick's other arguments against Kodak's construction are equally unpersuasive.  For instance, Colorquick attacks the inclusion of the word "fixed" in Kodak's construction because "[t]he word 'fixed' suggests that the template is static."  Opening Br. at 10.  But the term being construed is "*static* template," so the template *must be* static.[7]  Colorquick also attacks Kodak's construction as merely replacing the term "static template" with the term "fixed frame."

---

[7] Colorquick suggests that requiring the "static template" to be static would render claim 7 meaningless.  Opening Br. at 10.  To the contrary, claim 7 is directed to how the static template is created (*i.e.*, "dynamically"), not whether the template itself is static or dynamic.  '149 Patent at 12:27-30 ("The method of claim 2 wherein step (a) further comprises dynamically creating the static template to represent the predetermined area that the electronic document must fit in a layout of a physical printed document.").  The use of the term "static template" in claim 7 is fully consistent with Kodak's proposed construction.

*Id.* Notwithstanding that Kodak's construction plainly does more, it should be apparent that every definition of a word or phrase can be characterized as merely replacing one set of words with another – that is the essence of claim construction.  Finally, Colorquick again suggests that construing "static template" to require that it be "presented on a display screen" adds uncertainty to the construction, Opening Br. at 11, but as discussed above, the specification of the '149 patent describes the claimed invention in exactly those terms.  '149 Patent at 3:22-25.

### E.    "Postscript or PDF File"

The term "Postscript or PDF file" appears in asserted claims 11 and 35 of the '149 patent.  Based on the discussion of this term in Colorquick's brief, *see* Opening Br. at 11-12, it appears that the parties do not have a substantive disagreement about its meaning.  For that reason, and since the term is unlikely to be relevant to the infringement or validity issues in the case, Kodak agrees that the Court need not construe the term.

### F.    "Electronically Manipulating an Image Display of the Still Image Proxy"

Asserted claims 1-2 and 25-26 recite, in slightly varying forms, "electronically manipulating an image display of the still image proxy."[8]  The parties' claim construction positions are as follows.

---

[8] Claims 2 and 26, which depend respectively from claims 1 and 25, add the requirement that the image display of the still image proxy be electronically manipulated "in relation to the template."  The parties appear to be in agreement that this additional requirement does not require separate construction by the Court.

| Claim Language | Kodak's Construction | Colorquick's Construction |
|---|---|---|
| ***electronically manipulating an image display of the still image proxy*** and recording information about the manipulations | Using a computer program to modify the appearance of an image display of the still image proxy to ~~exactly~~ reflect the desired appearance of the electronic document when printed.[9] | No construction needed.<br><br>[or]<br><br>Construe only the term "electronically manipulating" to mean "managing, using or altering by electronic means." |

Kodak and Colorquick have taken starkly different approaches to the construction of the various "electronically manipulating" claim limitations.  For its part, Colorquick contends that no construction is necessary to assist the jury or, at most, the jury should be instructed only that the words "electronically manipulating" broadly mean "managing, using or altering by electronic means."  Opening Br. at 17.  Kodak, on the other hand, offers a construction intended to aid the jury in understanding how the claim term would be understood by a person skilled in the art in view of the patent specification.[10]  Such an approach is not only legally proper, but also absolutely necessary if the jury is to make a reasoned determination on the infringement and validity issues in this case.

---

[9] Upon further reflection, Kodak has deleted the word "exactly" from its proposed construction to account for potential non-material differences in appearance attributable to the different media used for the image display of the still image proxy (*i.e.*, a computer screen) and the electronic document when printed (*i.e.*, paper).

[10] Colorquick attacks Kodak's proposed construction as inconsistent with *Grantley Patent Holdings, Ltd. v. Clear Channel Commc'ns, Inc.*, No. 9:06CV259, 2008 U.S. Dist. LEXIS 1588, at *12 (E.D. Tex. Jan. 8, 2008), where this Court expressed disfavor with submitting "entire paragraphs of certain claims for construction when there was really no dispute over the meaning of any particular word or term."  But Kodak has done no such thing.  The parties plainly disagree about what it means to "electronically manipulat[e] an image display of the still image proxy," and Kodak has not requested construction of the second half of this limitation.  Colorquick's citation to *Grantley* is thus misplaced.

The specification makes it abundantly clear that "electronically manipulating" has a special meaning in the context of the '149 patent.  Indeed, the specification describes in substantial detail what this term is intended to encompass:

> The still image proxy can be manipulated in any manner that the original PDL image file may manipulated. In the embodiment of the present invention shown in FIGS. 8-13, two different manipulations can be performed, namely enlargement/reduction scaling of the entire image, and x-y coordinate transformations of the entire image with respect to the template. Any manipulations that can be performed on a PDF file can be performed on the still image proxy and the scope of the invention includes all such manipulations. Drag-and-drop mouse movements are used to reposition the still image proxy. The scale modifier slider bar is used to change the scale. The user makes such manipulations until the user is satisfied with the size and placement of the still image proxy with respect to the template borders.

'149 Patent at 7:10-24.

> The manipulations represent the net effect of changes made to each of the different types of manipulations. An example of physical manipulations made to an image in the embodiment shown in FIGS. 8-13 may be: 10 pixel movement in x axis; 20 pixel movement in y axis; 10% increase in scale. If other types of manipulations are allowed (e.g., contrast, stretching, foreground or background color changes), then these manipulations are also sent back to the web server. Pixel movements are translated into an actual dimension value, such as inches, based on the scale of the template and the actual size of the pixels.

*Id.* at 8:24-35.  Consistent with these disclosures, Kodak construes this element of the claim to require, in part, "using a computer program to modify the appearance of an image display of the still image proxy."

The second part of Kodak's proposed construction, which requires that the manipulations alter the appearance of the still image proxy so as "to reflect the desired appearance of the electronic document when printed," likewise springs directly from the specification and is fully in keeping with the stated purpose of the invention.  The specification expressly states that "[a]n important feature *of the present invention* is that this process allows the user to view exactly how the ad will appear within the purchased ad space . . . ."  *Id.* at 7:30-34.  Notably, this "important

feature" is not described merely as a characteristic of a preferred embodiment, but rather as a

feature of the invention itself, and as such it is proper to limit the scope of the claims

accordingly.  *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006)

(affirming claim construction underlying summary judgment of noninfringement in view of

repeated references in specification to features of "the present invention").

      In contrast to Kodak's construction, which again is firmly-grounded in the patent

disclosure, Colorquick proposes a broad, generic definition cobbled from a dictionary.  Opening

Br. at 17.  The only support in the '149 patent to which Colorquick points is the statement that

the scope of the invention includes "any manipulations that can be performed on a PDF file."  *Id.*

(citing '149 Patent at 7:10-19).  While Kodak's construction does not exclude any such

manipulations, Colorquick's construction would sweep in all manner of "managing, using or

altering by electronic means" regardless of whether or not they could be performed on a PDF

file.  By way of illustration, the inclusion of "using" in Colorquick's construction allows the

claim to encompass simply reading the contents of the still image proxy on a computer screen,

but that is obviously not what the inventor intended by "electronically *manipulating*."

      Colorquick's various attacks on Kodak's proposed construction reveal a concerted effort

to avoid imposing any meaningful limitation whatsoever on the scope of this claim term.  For

instance, Colorquick characterizes the requirement for "using a computer program" to perform

the manipulation as "superfluous" and "confusing," Opening Br. at 17-18, yet the '149 patent

consistently and without exception describes the "*electronic* manipulation" of the still image

proxy as being accomplished with a computer program.[11]  *See, e.g.*, '149 Patent at 6:61-7:39 (describing use of Flash program to manipulate the image display).

Colorquick also suggests that construing this claim term to require that the modifications of the still image proxy "reflect the desired appearance of the electronic document when printed" improperly excludes an embodiment described in the patent, Opening Br. at 18, but in making this argument, Colorquick seriously mischaracterizes the portion of the specification on which it relies.  Contrary to Colorquick's contention, Figure 20 of the patent does *not* disclose an embodiment in which the modified still image proxy fails to reflect the desired appearance of the printed document.  Figure 20 does not depict the still image proxy at all, but instead depicts a "design view" of the source code for the computer program used to perform the manipulations. '149 Patent at 10:48-51.  Indeed, even when the specification is trying to broaden the scope of the claimed invention, it does so in terms that are supportive of Kodak's construction.  *See id.* at 11:16-25 ("[T]he process may be initiated *at any time that the customer wishes to view how their electronic document will appear* in a predetermined area in which the electronic document must fit . . . .") (emphasis added).

As further evidence of how far Colorquick is attempting to stretch the scope of the patent claims, Colorquick argues that the "electronically manipulating" limitations should be construed to cover both "physical manipulations" of the image display of the still image proxy and "appending production specifications" to the still image proxy.  *See* Opening Br. at 16-17. Regarding the former, notwithstanding that the claim language expressly recites "electronic," not

---

[11] Notably, Kodak's construction uses the general term "computer program" to avoid the risk of error by unnecessarily limiting the scope of the claim to only Flash (described as the inventor's preferred embodiment), or even only to other browser-compatible programs. *See, e.g.*, '149 Patent at 6:30-33, 11:9-12.

"physical," manipulations, it appears that the cited portion of the specification is using the term "physical manipulations" to refer to the exact same type of electronic manipulations using the Flash program.  *See* '149 Patent at 8:20-35.  To the extent that portion of the specification can arguably be read as using the term "physical manipulations" to refer to the disclosed embodiment in which "production specifications" are appended to the still image proxy, *see, e.g.*, '149 Patent at 4:45-47 ("[T]he production specifications are physical manipulations of stock used in the print job."), Colorquick is improperly attempting to recapture through claim construction a scope of coverage that it gave up during prosecution of the '149 patent.

As originally filed, the application for the '149 patent included respective sets of claims directed to each of the "first embodiment" (claims 1-12, 20-31 and 39-50), "second embodiment" (claims 13-15, 32-34 and 51-53), and "third embodiment" (claims 16-19, 35-38 and 54-57).  *See* Application at 16-26 (Ex. C).  The "second embodiment" involves using the Flash program to append "production specifications" to the still image proxy, which can then be used by the print shop to prepare the print job.  '149 Patent at 4:34-53, 10:1-19.  Examples include indications of bindery specifications, perforation markings, and hole punch markings, as illustrated in Figure 18 of the patent.  However, in response to the patent examiner's requirement that Colorquick elect only one of the three embodiments for prosecution, Colorquick canceled all of the claims directed to the "appending production specifications" embodiment.[12]  Resp. to Restriction Requirement at 2 (canceling, *inter alia*, claims 13-15, 32-34 and 51-53).  The issued claims of the '149 patent cannot be construed to encompass the claim scope that was expressly

---

[12] Colorquick later filed a separate application directed to those claims, which recently issued as U.S. Patent No. 7,298,516 (Ex. E).  That patent is not at issue in this case (likely because the claimed functionality was in the prior art, as evidenced by InSite and other soft proofing products that pre-date Colorquick's earliest claimed invention date).

and unambiguously given up during prosecution.  *See ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003) ("The presence in the '989 specification of embodiments carried over from the parent application, but claimed in other patents, does not serve to broaden the scope of the '989 claims that were the subject of the divisional application.").

G.    **"Using the Information About the Manipulations to Revise the PDL Image File so as to Match the PDL Image File to the Manipulations Made to the Image Display of the Still Image Proxy"**

This term appears in slightly varying form in claims 1-2 and 25-26 of the '149 patent.[13]

The parties' construction positions are as follows.

| Claim Language | Kodak's Construction | Colorquick's Construction |
|---|---|---|
| *using the information about the manipulations to revise the PDL image file so as to match the PDL image file to the manipulations made to the image display of the still image proxy* | Using recorded information about the modification of the image display of the still image proxy to automatically modify one or more instructions in the PDL image file, such that the appearance of the electronic document when printed will be identical to the modified appearance of the image display of the still image proxy. | No construction needed. [or] Construe only the term "revise" to mean "change or modify." |

This limitation of the asserted claims goes to the very heart of what the '149 patent describes as the inventor's advance over the prior art.  *See, e.g.*, '149 Patent at 2:29-33 (suggesting that the claimed invention fills a need for additional tools "so that customers can more easily interact with their printing jobs within an automated environment when changes

---

[13] Claims 2 and 26, which depend respectively from claims 1 and 25, add the requirement that the PDL image file be matched to the manipulations of the still image proxy "in relation to the template."  As with the "electronically manipulating" elements discussed above, the parties appear to be in agreement that this additional requirement does not require separate construction by the Court.

must be made to their files"); *see also* Petition to Make Special, Oct. 17, 2002, at 3 (identifying only the "using the information" element of claim 1 as not disclosed in the prior art of record) (Ex. K).  Nevertheless, Colorquick contends that no construction is necessary or, at most, the Court need only construe the word "revise."  Opening Br. at 21.  However, the Federal Circuit has repeatedly held that it is legal error to construe a word in a claim without consideration of the context in which it appears.  *Pause Tech.*, 419 F.3d at 1331 ("[P]roper claim construction … demands interpretation of the entire claim in context, not a single element in isolation.") (quoting *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999)).

Colorquick relies heavily on this Court's decision in *Grantley* to encourage the Court to refuse to construe this claim element, or at most to construe only the single word "revise."  In *Grantley*, the Court found it "troubling" that the defendant submitted "entire paragraphs of certain claims for construction when there was really no dispute over the meaning of any particular word or term."  2008 U.S. Dist. LEXIS 1588, at *12.  That case is readily distinguishable because here, there most certainly *is* a dispute over the meaning of particular words or terms.  Specifically, it is apparent that the parties dispute what it means to "us[e] the information about the manipulations to revise the PDL image file" and "to match the PDL image file to the manipulations."  While the individual words in the claim may be commonplace, *in context* these are not common, everyday concepts with which a typical juror is likely to be familiar.  Thus, completely consistent with the approach suggested in *Grantley*, Kodak is asking this Court to construe those terms "that might be unfamiliar or confusing to the jury."  *Id.*

Despite Colorquick's complaint about the approach, Kodak's proposed construction is fully supported by the specification of the '149 patent.  For instance, the patent describes how the

"present invention" is used to match a PDL image file to the user's manipulations of the still

image proxy:

> The values that represent the physical image manipulations are used to modify the original predefined PDL image to match the physical modifications made to the still image proxy (step 60). More specifically, the web server passes data to a production server. *The production server uses the physical manipulations and/or production specifications to modify the original PDL-defined image in a manner identical to the modifications made to the still image proxy. This process is not a conversion of the still image proxy to a PDL image (here, a JPEG image to a Postscript file). Instead, it is the use of the recorded manipulations and appended production specifications to modify the original PDL image.* This process, referred to herein as 'Preflight Control: PDL Manipulations,' performs scaling, cropping and floating of the PDL image.  Details of this process are set forth in the Appendix.

'149 Patent at 8:44-59 (emphasis added).[14]  Given the complexity of this process, it is

unrealistic to expect that the jury will be able to accurately determine the proper scope of

this claim limitation simply by being instructed that the word "revise" means "change or

modify."

        As patentees in infringement cases often do, Colorquick seeks to avoid any meaningful

restriction on the scope of its patent claims by arguing that Kodak's construction improperly

imports limitations from the specification into the claims.  Opening Br. at 21-22.  However, a

person of ordinary skill in the art reading the '149 patent would understand the features about

which Colorquick complains to be necessary features *of the invention*, not just exemplary

embodiments.

        For instance, Colorquick argues that the claims do not require that the PDL file be

"*automatically* modified" to match the manipulations of the still image proxy, pointing to a

---

[14] The referenced Appendix is a source code listing for a prototype of the claimed invention, and includes computer code for automatically revising a PDL file in accordance with recorded manipulations of the still image proxy.  Dep. Tr. of J. Herr, Mar. 26, 2008, 154:9-155:20, 158:22-160:20 (Ex. J).  Mr. Herr is the named inventor of the '149 patent.

statement in the specification that such an automated process is merely "an option."  Opening Br.

at 22 (citing '149 Patent at 5:66-6:1).  However, read in context, the cited portion of the patent

actually discloses that the automated process is an alternative to the prior art manual process over

which the claimed invention supposedly improved:

> The customer is prompted with two options.  One option is similar to the
> conventional ColorQuick preflight process described above which is to send a
> corrected file which requires manual intervention by the customer.  Another
> option *in accordance with the present invention* is to select an automated process
> called Quick-Fit™. A QuickFit icon is shown in FIG. 6. If the user selects
> QuickFit, *no manual intervention is required* to address the sizing problem.
> Instead, the customer manipulates the ad via a browser-based application, the
> manipulations are delivered back to the service bureau, and *the service bureau
> uses automated software to revise the original image file* based on the
> manipulations.

'149 Patent at 5:62-6:7 (emphasis added).[15]

In *Ormco Corp. v. Align Technology Inc.*, 498 F.3d 1307 (Fed. Cir. 2007), the Federal

Circuit affirmed summary judgment of noninfringement after finding that the district court

properly rejected a claim construction argument almost identical to Colorquick's.  The patents at

issue were directed to the use of orthodontic appliances to incrementally reposition teeth, and the

district court construed the asserted claims as requiring an automated determination of the finish

tooth positions even though automation was not expressly recited in the claims, and despite the

patentee's argument that such automation was only a preferred embodiment.  *Ormco*, 498 F.3d at

1312-13.  The Federal Circuit found that, just like here, "it is clear that the inventors' primary

basis for distinguishing their invention was its high level of automation . . . ."  *Id.* at 1313.

Likewise, the appellate court found that "[n]owhere does the specification suggest or even allow

---

[15] When this portion of the specification refers to "the conventional ColorQuick preflight
process described above," it is referring to the discussion in the Background of the Invention
section, which begins "In one conventional (prior art) preflight process performed by
ColorQuick.com, L.L.C. . . . ."  '149 Patent at 1:45-61.

for human adjustment of the computer-calculated tooth finish positions."  *Id.*  The same analysis
applies with equal force to the '149 patent which, in addition to the disclosures noted above,
characterizes the claimed invention as fulfilling a need for additional tools "so that customers can
more easily interact with their printing jobs *within an automated environment* when changes
must be made to their files."  '149 Patent at 2:29-33 (emphasis added).

Colorquick also seeks to avoid construing the claim language to require that the PDL
image file be modified such that the appearance of the electronic document when printed is
identical to the modified appearance of the image display of the still image proxy, Opening Br. at
22-23, yet the '149 patent itself confirms that this is a characteristic of the claimed invention, not
just a preferred embodiment:

> *An important feature of the present invention* is that this process allows the user to
> view exactly how the ad will appear within the purchased ad space ....

'149 Patent at 7:30-34 (emphasis added).  When a patent expressly describes features as
pertaining to "the invention," as opposed to merely a preferred embodiment, "[t]he public is
entitled to take the patentee at his word."  *Honeywell*, 452 F.3d at 1318.  Colorquick also argues
that the claims and specification require only that the PDL file be modified in a manner
"consistent with" the manipulations made to the image display of the still image proxy, but the
portion of the specification it cites as support actually uses the word "identical":

> The production server uses the physical manipulations and/or production
> specifications to modify the original PDL-defined image *in a manner identical to
> the modifications made to the still image proxy.*

'149 Patent at 8:48-51 (emphasis added).  Thus, Colorquick's claim construction argument flies
in the face of the very disclosure on which it purports to rely (but notably failed to quote).

## V.      <u>CONCLUSION</u>

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Phillips*, 415 F.3d at 1316.  Kodak's proposed constructions satisfy this well-settled tenet of patent law, while Colorquick's do not.

For the reasons set forth above, Kodak respectfully requests that the Court adopt Kodak's proposed construction for each of the disputed claim terms.  Kodak's constructions accurately reflect the meaning of the claim language when read in light of the specification and prosecution history of the patent-in-suit.  ColorQuick's constructions, on the other hand, are based largely on extrinsic evidence, ignoring the weight of the intrinsic evidence to erroneously expand the scope of the claims far beyond what the '149 patent describes as the inventor's actual invention.


Respectfully submitted,

*/s/ Jennifer Parker Ainsworth*

Dated:  May 1, 2008                                         Jennifer Parker Ainsworth
State Bar No. 00784720
jainsworth@wilsonlawfirm.com
**WILSON, ROBERTSON &
    CORNELIUS, PC**
One American Center
909 ESE Loop 323, Suite 400
Tyler, Texas 75701
Telephone: (903) 509-5000
Facsimile: (903) 509-5092

Mark M. Supko (*pro hac vice*)
msupko@crowell.com
David D. Cross *(pro hac vice)*
dcross@crowell.com
**CROWELL & MORING, LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

*Attorneys for Defendant*
*Eastman Kodak Company*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who have consented to electronic service, Local Rule CV-5(a)(3)(A), on this the 1st day of May, 2008.

 /s/ *Jennifer P. Ainsworth*_____
Jennifer P. Ainsworth