## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| COLORQUICK, LLC | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:06-CV-390 |
| | § | |
| EASTMAN KODAK CO. | § | |

## MEMORANDUM OPINION & ORDER

The Court now issues this claim construction opinion construing the terms in U.S. Patent No.

6,839,149 (hereinafter "the '149 patent").

### THE '149 PATENT

The '149 patent, titled "Preparation of Production Data for a Print Job Using a Still Image

Proxy of a Page Description Language Image File," describes and claims a process of submitting

documents for printing.  The process was designed to streamline the interaction between a customer

seeking to print a document and the print shop.

### APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381

F.3d 1111, 1115 (Fed. Cir. 2004)).  In claim construction, courts examine the patent's intrinsic

evidence to define the patented invention's scope.  *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*,

388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Communications Group,*

*Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  This intrinsic evidence includes the claims themselves,

the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388

F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one

of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The Court begins, as it must, with the words of the claim. *See Teleflex*, 299 F.3d at 1324; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("The terms used in the claims bear a presumption that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art."). The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314-15.

Claims "must be read in view of the specification, of which they are a part." *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of

2

the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325.  But, "although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Phillips*, 415 F.3d at 1323.  The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id*. at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court.  *Id*.  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Id*.

Finally, it is important to remember that although the specification often describes very specific embodiments of the invention, the Federal Circuit has cautioned against confining the claims to those embodiments.  *See Phillips*, 415 F.3d at 1323.  The roles of the specification are to "teach

3

and enable those of skill in the art how to make and use the invention and to provide a best mode for doing so.  One of the best ways to teach a person of ordinary skill how to make and use the invention is to provide an example of how to practice the invention in a particular case." *Id*.  "'[T]he claims of the patent, not its specifications, measure the invention.'" *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004) (citation omitted).  "Accordingly, particular embodiments appearing in the written description will not be used to limit claim language that has broader effect.  And, even where a patent describes only a single embodiment, claims will not be interpreted 'restrictively unless the patentee has demonstrated a clear intention to limit the claim scope 'using words or expressions of manifest exclusion or restriction.'" *Id*. at 1117 (citations omitted).

**TERMS TO BE CONSTRUED**

The terms at issue include: "still image proxy," "image display," "PDL image file," "static template," "electronically manipulating an image display of the still image proxy," and "using the information about the manipulations to revise the PDL image file so as to match the PDL image file to the manipulations made to the image display of the still image proxy."

## I.    Agreed Terms

At the *Markman* hearing, the parties agreed on constructions for the terms "image display" and "PDL image file."  The parties agree "image display" means "a visual representation shown on a display screen."  The parties also agree "PDL image file" means "a computer file containing page description language (PDL) code that defines the appearance of an electronic document when printed."  The Court adopts the parties' constructions as the constructions of the Court.

## II.   Disputed Terms

4

A.      "Still Image Proxy"

For the term "still image proxy," Colorquick proposes the construction "a substitute still image file, which may be a JPEG, GIF, and PNG file, or the like."  Kodak proposes the construction "a computer file, such as a JPEG, GIF, PNG, or the like, that substitutes for the PDL image file and specifies the appearance of the electronic document when presented on a display screen."  The parties' proposals evince agreement on large portions of the construction.  For example, the language "a JPEG, GIF, and PNG file, or the like" is included in both constructions, and is supported by the specification.  *See* '149 patent col. 3:66-67 ("The still image proxy may be a JPEG file, a GIF file, a PNG file, or the like").  The parties' constructions also both characterize a "still image proxy" as a "file," that it is "still," and a  "substitute" for something.  All of the agreements are consistent with the specification and the patent as a whole, and the Court therefore adopts them as part of the ultimate construction.

The parties' chief disagreement centers on Kodak's inclusion of the qualifying phrase indicating the still image proxy "specifies the appearance of the electronic document when presented on a display screen."  Kodak argues Colorquick's proposed construction is inadequate because it merely states what type of file the still image proxy is without any further guidance.  Kodak argues that without its proposed language noting the still image proxy "specifies the appearance of the electronic document when presented on a display screen," the jury could be confused as to the differences between the "still image proxy" and "PDL image file."[1]  In contrast, Colorquick argues that adding Kodak's proposed language would conflate the meaning of "still image proxy" with the

---

[1]      Kodak argues the "PDL image file" is how the printer is going to depict the image, while the "still image proxy" defines how the user is going to see the image on the display screen, and its proposal captures these distinctions.

other two similar terms being construed ("image display" and "PDL image file"), and is therefore redundant and confusing.

Kodak points to certain aspects of the specification and the prosecution history in support of its argument that the still image proxy "specifies the appearance of the electronic document when presented on a display screen." First, Kodak notes the specification discusses how the "PDL-defined image is converted into a still image proxy, such as a JPEG (.jpg) file, a GIF (.gif) file, or a PNG (.png) file, thereby creating a still image proxy *representation* of the original PDL image," '149 patent col. 6:19-24 (emphasis added), and how the "still image proxy (here, the JPEG image) is inserted into a browser-compatible program that allows a user to manipulate the JPEG image. . . The inserted JPEG image effectively becomes a 'proxy' for the original PDL image." '149 patent col. 6:30-35. Kodak also points to the prosecution history, and in particular one passage where the applicant was responding to the patent examiner's objection, where the patentee noted:

> The disclosure was further objected to because it was unclear to the Examiner as to whether the still image proxy is referring to images displayed on a screen or to a file containing data. In response, a file is created that represents the still image proxy. The still image proxy shown in Figs. 8-13 is a <u>display of that file</u>.

Reply to Office Action of March 10, 2004 at 19, Application No. 10/103,510; (Doc. No. 55, Ex. I) (emphasis in original). Kodak argues this amendment and the passages in the specification offer clear support for the inclusion of its language that the still image proxy "specifies the appearance of the electronic document when presented on a display screen."

In response, Colorquick argues the cited section of the prosecution history merely reflects the confusion over whether it is the image display or the still image proxy that is electronically manipulated, and argues the amendment was made for the sake of clarity. Drawing on another

6

section of the same Reply to Office Action of March 10, 2004, Colorquick notes the language in the specification and claims was changed from "manipulate the still image proxy" to "manipulate the image display of the still image proxy" in order to reflect the differences between the terms. Colorquick argues that Kodak's proposed constructions for "image display," "still image proxy," and "PDL image file" conflate the meaning of the terms if the extra language discussing the appearance of the electronic document is added into the definition of "still image proxy."

As an initial matter, the Court agrees with Kodak that including the language "substitutes for the PDL image file" is necessary, and is supported by the claims and specification. *See* '149 patent col. 11:52 (claim 1 discussing "creating a still image proxy of the PDL image file"); '149 patent col. 6:20-22 (specification describing how the still image proxy acts as a "representation of the original PDL image"); '149 patent col. 6:30-35 (specification referencing the still image proxy as 'the JPEG image' in this instance, and noting "[t]he inserted JPEG image effectively becomes a 'proxy' for the original PDL image"). However, the remainder of Kodak's proposal is unpersuasive. While there is ample discussion throughout the claims and specification regarding the still image proxy's role as a substitute file to the PDL image file, there is nothing indicating the still image proxy must also "specif[y] the appearance of the electronic document when presented on a display screen." Adopting such language would improperly read an unsupported functional limitation into the claim.

In addition to being unsupported by the specification or claims, the Court also agrees with Colorquick that Kodak's proposed construction would conflate the meaning of the image display and still image proxy. Though "image display of the still image proxy" is a phrase used throughout the claims, the patentee was careful to draw distinctions between the two terms. For the term "still image proxy," the claims and specification only specify that the still image proxy is a computer file

7

that substitutes for the PDL image file.  *See, e.g.,* '149 patent col. 3:65-67 ("The still image proxy

may be a JPEG file, a GIF file, a PNG file, or the like"), '149 patent col. 6:30-35.  The patentee used

a separate term, "image display," to describe the graphic depiction of the file.  At the *Markman*

hearing, the parties agreed "image display" means "a visual representation shown on a display

screen."  The parties' agreed construction is consistent with the specification, which continually

notes the image display is what the user sees and ultimately manipulates.[2]   As the visual

representation, it would be more accurate to say the image display "specif[ies] the appearance" of

what is being presented or shown on that display screen.[3]  Kodak's proposal also raises questions

as to what it means to "specify" the appearance of an image.  Under any circumstances, Kodak's

definition is likely to cause further confusion with regard to the distinction between the "image

display" and "still image proxy."  The patent was careful to draw such a distinction, and the Court

must not ignore the functional differences of the terms.

In citing the prosecution history, Kodak is effectively attempting to limit claim scope based

on one unclear passage in an early amendment.  However, the passage is an outlier in the discussion

---

[2]

It is noted throughout the specification that the user views and electronically manipulates the image display, not the still image proxy itself.  *See, e.g.,* '149 patent col. 3:61-62 ("An image display of the still image proxy is electronically manipulated"); '149 patent col. 4:21-24 ("The still image proxy may be inserted into a browser-compatible application program . . . that allows for electronic manipulation of the image display of the still image proxy within a browser"); '149 patent col. 4:38-42 ("[A] still image proxy is created of the PDL image file.  Production specifications are electronically appended to the image display of the still image proxy"); '149 patent col. 5:2-5 ("An image display of the still image proxy is displayed . . . and is then electronically manipulated").

[3]

The patent describes a process whereby a user manipulates the image display and records the manipulations in order to revise the PDL image file for printing preparation.  The prosecution history indicates the still image proxy, as a file, does not change after it is created.  Reply to Office Action of March 10, 2004 at 19, Application No. 10/103,510; (Doc. No. 55, Ex. I).  Instead, the user manipulates the "visual appearance of the file," and "[t]he manipulations are then captured and subsequently used to revise the PDL image file."  *Id.*  Given that the prosecution history indicates the still image proxy does not change after creation, and the entirety of the intrinsic evidence indicates the image display does change via the manipulation process, it would be problematic to say the still image proxy must always "specify the appearance" on the display screen.

of the differences between the terms "image display" and "still image proxy," and when read in full

context, does not support Kodak's proposition.  The passage Kodak cites states "[t]he still image

proxy shown in Figs. 8-13 is a <u>display of that file</u>."  Reply to Office Action of March 10, 2004 at 19,

Application No. 10/103,510; (Doc. No. 55, Ex. I).  First, it is unclear how the passage offers any

clear support for Kodak's proposed construction.  Nothing in the Reply indicates the still image

proxy "specifies the appearance of the electronic document when presented on a display screen."

While at first glance the passage seems to indicate the still image proxy is a "display," the passage

was ultimately part of a greater amendment where the phrase "image display of the still image

proxy" was included throughout the specification to highlight the difference between the display of

the file and the file itself.  *Id.* at 3-19.  Prior to the amendment, the specification and claims referred

generally to a "still image proxy" or "still image format proxy" without distinction between the file

and graphic display.  *See generally* Reply to Office Action of March 10, 2004, Application No.

10/103,510; (Doc. No. 55, Ex. I).  The examiner was "unclear" on the issue, and the amendments

were made for the sake of clarification.  The distinction is important because, as the Reply indicates,

the image display is manipulated while "the file itself does not change."  *Id.* at 19.  The parties have

already agreed that the "image display" is the "visual representation shown on a display screen," and

the "still image proxy" is a file of some sort.  Therefore, not only does the passage not support

Kodak's proposed construction when read in full context, but the passage in the prosecution history

also cuts against the parties' agreed construction for "image display."[4]  Ultimately, the passage

Kodak cites does not evince a clear disavowal of claim scope, or even any clear support for Kodak's

---

[4]

      As noted above, the parties agreed that "image display" is a "visual representation shown on a display screen." The passage of the prosecution history, taken out of context (as Kodak has presented it), seems to indicate the still image proxy is somehow the graphic display.

proposition, such that Kodak's proposed limitation would be appropriate to read into the construction.

Considering and incorporating the parties' agreements, arguments, and concessions, the Court adopts "a still computer file, such as a JPEG, GIF, PNG or the like, that substitutes for the PDL image file" as the Court's construction for "still image proxy."

### B.     "Static Template"

For the term "static template," Colorquick argues the term needs no construction. However, should the Court decide to construe the term, Colorquick offers in the alternative "a template that defines a predetermined area for an image display of a still image proxy." Kodak proposes: "a fixed frame presented on the display screen that corresponds to a predetermined area in which the electronic document must fit when printed, and in relation to which the image display of the still image proxy is manipulated." At the *Markman* hearing, the parties agreed on the opening portion of the construction: "a template shown on a display screen that when set..."[5] However, the parties were unable to agree on the remainder of the construction. Specifically, the parties' dispute focused on the appropriateness and scope of the "predetermined area" language. After considering the arguments of the parties at the hearing, the Court agrees with Kodak that the term requires

---

[5]     Colorquick's proposed construction did not address the "static" aspect of the term at all, while Kodak used "fixed frame" in its proposal to describe the static template. Both proposals are problematic since "fixed frame" is never specifically mentioned in the patent, but reading out the "static" aspect of the "static template" would improperly broaden the term. A claim construction that gives meaning to all terms of a claim is preferred over one that does not, *Merck & Co. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1372 (Fed.Cir.2005), and use of the agreed phrase "when set" communicates the static aspect of the template without reading out the "dynamically creat[ed]" aspect discussed in the claims.

construction.[6]

Starting with the claim language, dependent claim 2 references "creating a static template that defines the predetermined area and displaying the image display of the still image proxy in association with the template." '149 patent col. 11:63-65. Also in claim 2, the "predetermined area" is described as an area "in which the electronic document must fit." '149 patent col. 11:61-62. Dependent claim 7 also discusses "creating the static template to represent the predetermined area that the electronic document must fit in a layout of a physical printed document." '149 patent col. 12:28-30. The specification offers similar limiting language whenever the static template is discussed. *See, e.g.,* '149 patent col. 4:1-6; '149 patent col. 4:62-65. At the *Markman* hearing, Colorquick conceded that the static template "defines a predetermined area in which an electronic document must fit." Despite this concession, Colorquick continued to oppose including this language, arguing the surrounding language of the claims make it obvious, and adding language to its proposal risks confusing the jury. However, Colorquick's proposal, which defines the term as "a template that defines a predetermined area for an image display of a still image proxy," is overbroad, and also leaves ambiguity regarding what comprises the "predetermined area." Both claims 2 and 7 are limiting in that the electronic document must fit in the predetermined area defined by the static template. Therefore, the Court finds the language noting the static template "defines a predetermined area in which the electronic document must fit" is necessary both to accurately

---

[6]

Though Colorquick initially proposed the language "a template that defines a predetermined area for an image display of the still image proxy," during the *Markman* hearing Colorquick conceded that the static template also "defines a predetermined area in which an electronic document must fit." *See* '149 patent col. 4:3-4. Between Colorquick's proposal and its concession at the *Markman* hearing, the Court already has been presented with different possible functions of the static template. In the interest of avoiding any confusion, the Court finds that defining "static template" is therefore necessary.

define "static template," and also to avoid juror confusion.

Finally, the claims also discuss "displaying the image display of the still image proxy in association with the [static] template." '149 patent col. 11:63-65.   The discussion in the specification mirrors the claim language.   *See* '149 patent col. 4:3-6 ("A static template is dynamically created that defines the predetermined area and the image display of the still image proxy is then displayed in association with the [static] template"); '149 patent col. 5:2-5 ("An image display of the still image proxy is displayed in association with the template and is then electronically manipulated").   Though worded differently, the parties' constructions reflect the claim and specification language noting the link between the static template and the image display of the still image proxy, and such language should be reflected in the term's construction.

With all of the above taken into consideration, the Court adopts the following construction for the term "static template": "a template shown on a display screen that when set corresponds to a predetermined area in which the electronic document must fit, and is displayed in association with the image display of the still image proxy."[7]

### C.      "Electronically manipulating"

Colorquick argues the term "electronically manipulating" needs no construction.   However, in the event the Court finds the term requires construction, Colorquick proposes: "managing, using or altering by electronic means."   Kodak initially proposed "using a computer program to modify the appearance of an image display of the still image proxy relative to the static template to reflect the

---

[7]

Kodak also proposed additional limiting language stating the static template corresponds to a predetermined area in which the electronic document must fit "when printed."   The Court finds the "when printed" language to be unsupported by the patent, and even were it supported, such language is unnecessary for proper construction.

desired appearance of the electronic document when printed."[8]  Both proposed constructions would raise more issues than they would solve.  Colorquick's alternate proposal is overly broad and vague. As noted by Kodak at the *Markman* hearing, using such general language such as "managing, using or altering" could lead a jury to conclude certain activities which are unquestionably outside the scope of invention, such as powering off the image display or simply looking at the image display, nonetheless constitute "electronic manipulation."  Kodak's proposal is equally problematic.  The language "using a computer program" opens questions as to what qualifies as a "computer program," and similarly raises issues as to what qualifies as "using" such a program.  The second half of Kodak's proposal, "to reflect the desired appearance of the electronic document when printed," would also raise questions as to what "reflect" means, and could improperly read certain disclosed embodiments out of the claims.[9]  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.

---

[8]

At the *Markman* hearing, Kodak noted it dropped the "relative to the static template" language in its proposal.

[9]

Kodak's primary support for its proposed language "to reflect the desired appearance of the electronic document when printed," comes from one section of the specification, which states: "[a]n important feature of the present invention is that this process allows the user to view exactly how the ad will appear within the purchased ad space."  '149 patent col. 7:30-34.  Kodak argues that by using the language "an important feature of the present invention," the patentee was limiting the invention in line with Kodak's proposed language.  As support, Kodak cites a Federal Circuit case where the Court limited the claims of a patent to a fuel filter because the specification referred to the fuel filter as "this invention" or "the present invention" at least four times, and no other parts were described.  *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316-18 (Fed. Cir. 2006).  However, unlike the situation in *Honeywell Int'l*, the section of the specification Kodak cites is describing a single embodiment of the invention rather than the sole embodiment.  The *Honeywell Int'l* opinion does not stand for the proposition that the claims must be limited to what is being described whenever language such as "the present invention" or "an important feature of the present invention" is used in the specification.  *See, e.g., Durr Sys., Inc. v. FANUC Ltd.*, 463 F. Supp. 2d 663, 677 n.13 (E.D. Mich. 2006) (refusing to use *Honeywell Int'l* as a basis of limiting the invention to a single embodiment solely because the patent uses language such as "the present invention" when the single embodiment is not the sole embodiment).  The patent must be examined in context, and the Court must be careful not to limit the invention to a particular embodiment.

In this instance, adopting Kodak's proposal could mean reading out certain embodiments.  To the extent Kodak proposed the "reflect" language to mean the appearance of the image display will appear identical to the printed electronic document, using "reflect" could mean reading out the process of manipulating the image display by appending production specifications.  As discussed in more detail later in this opinion, the specification teaches appending production specifications can be part of the manipulation process.  *See, e.g.,* '149 patent col. 4: 39-42; '149 patent col. 8:11-17.  However, the specification is unclear whether the production specifications must appear on the image display along with the ad itself.  Figure 18, which shows one example of appending bindery production specifications, simply

13

Cir. 1996) (finding that a claim interpretation that excludes embodiments is "rarely, if ever, correct").

Aside from the problems with the parties' proposals, the Court cannot decline to construe the term for a number of reasons. First, the term is not readily or easily understood, and therefore needs to be construed in the context of the patent for the jury. In addition, the parties' arguments raise issues concerning claim scope, and the parties' dispute would remain unresolved by following Colorquick's suggestion of simply adopting the ordinary meaning of "electronically manipulating." Therefore, pursuant to the Federal Circuit's ruling in *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, — F.3d ----, 2008 WL 878924, at *8 (Fed. Cir. 2008), the Court concludes that construing the term is necessary in order to resolve the dispute in this instance.

The claim scope dispute argued by the parties concerns whether the claims of the '149 patent could properly cover appending production specifications and other 'physical' manipulations as part of the "electronic manipulation" discussed in the claims.[10] Colorquick argues the claim and specification language offers a broad scope of potential "manipulations." For example, the specification states "the still image proxy can be manipulated in any manner that the original PDL image file may [be] manipulated," and "[a]ny manipulations that can be performed on a PDF file can be performed on the still image proxy and the scope of the invention includes all such manipulations." '149 patent col. 7:10-19. Colorquick also points to various portions of the

---

shows a blank page in addition to the production specifications. '149 patent fig. 18. Ultimately, the patent is unclear whether appended production specifications are reflected in the desired appearance on the image display, and therefore limiting the claims as Kodak proposes would be inappropriate. *See also* discussion *infra* Part II.D.2.

[10]

Kodak argues the electronic manipulations are effectively limited manipulations such as moving and sizing, while Colorquick argues the patent covers manipulations such as moving and sizing, and also other manipulations such as appending production specifications. In the specification, there are examples of production specifications. One such example is a bindery specification, which "may include operations such as perf, score, fold, collate, stitch, emboss, deboss, and die-cut." '149 patent col. 8:11-17.

specification discussing "physical manipulations" and "production specifications." *See* '149 patent col. 4:39-42 (describing second embodiment of the invention, and noting "[p]roduction specifications are electronically appended to the image display of the still image proxy and information about the productions specifications are recorded"); '149 patent col. 8:11-14 (describing appending production specifications as "another feature or the present invention"); '149 patent col. 10:10-11 (describing Fig. 19 as "show[ing] another example of production specifications that may be added to the still image proxy, other than bindery data"); '149 patent col. 4:45-49 (describing embodiment where production specifications "are physical manipulations of stock used in the print job"). When isolated from the prosecution history, Colorquick's argument finds little reasonable opposition. The specification discusses electronic manipulation in sweeping and permissive language, *e.g.*, '149 patent col. 7:17-19, and specifically discusses electronically appending production specifications as within the scope of the invention. *See, e.g.,* '149 patent col. 8:11-17.

Despite the ample support in the specification for Colorquick's position, Kodak argues Colorquick surrendered claim coverage of physical manipulations or appending production specifications during the course of prosecution. During prosecution, the patent examiner determined the claims were drawn to three patentably distinct species of the claimed invention, and issued a restriction requirement, which required the applicant to elect a single disclosed species for further examination. *See Laboratoires Perouse, S.A.S. v. W.L. Gore & Assocs., Inc.*, 528 F. Supp. 2d 362, 368 n.4 (S.D.N.Y. 2007) (citing 37 C.F.R. § 1.142(a)). In response to the restriction requirement, the applicant filed an amendment electing embodiment I, which coincided with the claims in the issued '149 patent: a system where one creates a still image proxy, electronically manipulates the image display of the still image proxy, and uses the information about the manipulations to revise

15

the PDL image file.  The applicant made the election of embodiment I "without traverse," meaning the applicant chose not to dispute the examiner's restriction requirement.  *See* MANUAL OF PATENT EXAMINING PROCEDURE § 818.03(b) (8th ed., Rev. 5, 2006) ("The election of an invention may be made with or without traverse.  To reserve a right to petition, the election must be made with traverse").  Kodak argues the claims of embodiment II, which generally dealt with appending production specifications to the still image proxy, were ultimately abandoned as to the issued '149 patent when the applicant elected to pursue embodiment I without traverse.  Therefore, despite language to the contrary in the issued '149 patent, Kodak asserts the '149 patent claims cannot cover physical manipulation or appending production specifications.

On the whole, previous cases dealing with similar arguments offer very little support for Kodak's position.  Most courts that have considered similar issues have questioned the relevance of a restriction requirement in claim construction.  *See Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, 2000 WL 34204509, at *15-16 (N.D. Cal. 2000) ("[T]he applicants' compliance with an administrative requirement (*i.e.*, the restriction requirement) . . . in the parent application, is entitled to little weight as against the applicants' claims as amended, and the Examiner's allowance of those claims, in the issued '648 patent").  *See also Laboratoires Perouse, S.A.S.*, 528 F. Supp. 2d at 374 (noting "the Court is aware of [no case law] that suggests a restriction requirement limits the construction of claims in a later filed divisional application"); *Michaels of Or. Co. v. Clean Gun, LLC*, 2002 WL 31496414, at *8 (D. Or. 2002) ("Restriction requirements do not constitute a substantive claim construction doctrine."); *R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1438 (N.D. Ill. 1996) (refusing to limit scope of patent claims on basis of restriction requirement because the claims and patent specification were not limited).  A restriction requirement is generally

considered an administrative tool for the purpose of case management, controlling filing and search fees, and facilitating administration in the PTO.  *Laboratoires Perouse, S.A.S.*, 528 F. Supp. 2d at 374.  Even when it has been considered as part of claim construction, courts have generally afforded it little weight as against unambiguous language in the claims and specification.  *See id.* at 374-75; *Amersham Pharmacia Biotech, Inc.*, 2000 WL 34204509, at *15-16; *R2 Med. Sys., Inc.*, 931 F. Supp. at 1438.

When the Federal Circuit has weighed in on the issue, the results have been mixed.  Kodak cites *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003), where, when faced with embodiments in a divisional patent carried over from a parent application after a restriction requirement, the Federal Circuit stated "[t]he presence in the '989 specification of embodiments carried over from the parent application, but claimed in other patents, does not serve to broaden the scope of the '989 claims that were the subject of the divisional application."  Colorquick cites a different Federal Circuit case where the Court noted:

> We also do not assign much weight to the patent examiner's restriction requirement [...] during prosecution of the '084 application.  In making the restriction requirement, the examiner did not construe the claim term [...] or determine its meaning in light of the written description.  He merely required that the applicant elect one aspect of his invention for prosecution without applying it to the specification.

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006).  The value of the quotes from the two cases to the issue before the Court can be disputed, but it should be noted that besides *ACCO*, Kodak cites no other authority and the Court is aware of none supporting Kodak's argument.  There have been multiple cases since *ACCO*, including the Federal Circuit's statement in *Honeywell Int'l*, which indicate restriction requirements are, at best, of limited value as a claim

construction tool.  *See, e.g., Honeywell Int'l, Inc.*, 452 F.3d at 1319;  *Laboratoires Perouse, S.A.S.*, 528 F. Supp. 2d at 374.

There is no dispute that the prosecution history informs the interpretation of patent claims "by excluding any interpretation of the claim language that would permit the patentee to assert a meaning for the claim that was disclaimed or disavowed during prosecution in order to obtain claim allowance."  *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1421 (Fed. Cir. 1994). However, a court must be careful not to improperly import limitations from the prosecution history into the claims.  *Bristol-Myers Squibb Co. v. Andrx Pharm., Inc.*, 343 F. Supp. 2d 1124, 1142 (S.D. Fla. 2004) (citing *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.*, 976 F.2d 1559, 1566 (Fed. Cir. 1992)).  The prosecution history is an interpretative guide–on its own, it cannot "enlarge, diminish, or vary" the limitations in the claims.  *Markman*, 52 F.3d 967, 980.  In order to restrict a claim at the *Markman* stage based on a limitation found in the prosecution history, there must be clear and unequivocal admissions by the patent holder.  *Amgen, Inc. v. Hoffmann-La Roche Ltd.*, 494 F. Supp. 2d 54, 70 (D. Mass. 2007).  Absent evidence of a clear disavowal in the prosecution history, the Court should not deviate from the claim meanings compelled by the remainder of the intrinsic evidence.  *McNeil-PPC, Inc. v. Perrigo Co.*, 443 F. Supp. 2d 492, 505 (S.D.N.Y. 2006) (citing *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005)).

The circumstances surrounding the restriction requirement, as evidenced in the prosecution history, do not amount to the patentee clearly disavowing at least some claim coverage for appending production specifications.  While the patentee did elect to pursue embodiment I (dealing with creating a still image proxy, manipulating the image display, and recording the manipulations)

18

instead of embodiment II (which generally dealt with appending production specifications), using a restriction requirement to say the patentee "disclaimed" or "disavowed" claim scope during prosecution is problematic in this instance.  First of all, as noted by the significant number of other courts refusing to use restriction requirements to limit the claims during claim construction, a restriction requirement is an administrative tool, and therefore offers little guidance in construing the claim language.  *See, e.g., Amersham Pharmacia Biotech, Inc.*, 2000 WL 34204509, at *15 ("Here, in contrast, the election was purely administrative and offers little insight into construction of the '648 claims.").  A restriction requirement for administrative reasons is typically employed early in the prosecution to control the Examiner's time, and is often utilized prior to determining the scope or boundaries of any claims.  *Id.* at 16; *see also Honeywell Int'l, Inc.*, 452 F.3d at 1319 (refusing to use limit claims based on restriction requirement because Examiner "merely required that the applicant elect one aspect of his invention for prosecution without applying it to the specification").  Furthermore, the restriction requirement itself does not mean there can be no overlap between elements of the elected and unelected claims.  The examiner did not construe the claim term or determine its meaning in light of the written description when making the restriction requirement.  *See Honeywell Int'l, Inc.*, 452 F.3d at 1319.  Therefore, it is entirely possible that the elected species pursued by the patentee, which ultimately issued as the '149 patent, could reasonably cover certain aspects of appending production specifications as part of the electronic manipulation of the image display without entering the realm of the unelected species.  Because the restriction requirement in this case was purely administrative, it offers only speculative evidence that the patentee intended to surrender claim scope, and no evidence indicating the Examiner felt there could be no overlap between the elected species and the embodiments that were not pursued.  The patent ultimately

issued with significant portions of the specification discussing appending production specifications in unambiguous phraseology.  Adopting Kodak's argument would require the Court and the jury to ignore these portions of the issued patent based on a conjectural determination that the patentee intentionally surrendered claim scope in response to an administrative decision designed primarily to control the Examiner's time. *Amersham Pharmacia Biotech, Inc.*, 2000 WL 34204509, at *15 ("A restriction requirement is not a rejection and it cannot be used to controvert the plain language of the claim").

Certainly the restriction requirement, as part of the prosecution history, is part of the intrinsic evidence for the Court to consider.  However, the remainder of the intrinsic evidence, specifically the specification, weighs heavily against Kodak's all-or-nothing argument that Colorquick unequivocally surrendered any claim scope early in the prosecution of appending production specifications as part of the electronic manipulation.  In this instance, the discussion in the specification offers clearer and more persuasive insight into the patentee and Examiner's intention and decisions regarding the '149 patent's permissible scope.  Ultimately, just as in the *Amersham Pharmacia Biotech* case, "the restriction requirement is far too ambiguous to subvert the claim language as approved by the Patent Office, [particularly] when taken with the unambiguous statements in the specification." *Amersham Pharmacia Biotech, Inc.*, 2000 WL 34204509, at *15. Therefore, the Court rejects Kodak's argument, and finds that appending production specifications, to the extent it is discussed in the specification, is within the scope of the electronic manipulation discussed in the claims.

For the reasons discussed above, the Court construes "electronically manipulating" as: "electronically modifying the appearance of the image display of the still image proxy, or

20

electronically appending production specifications."

**D. "Using the information about the manipulations to revise the PDL image file so as to match the PDL image file to the manipulations made to the image display of the still image proxy"**

For the phrase in question, Colorquick again proposes that no construction is needed. However, in the event the Court feels any portion of the language is unclear, Colorquick asserts that only the term "revise" could present any confusion for a jury, and for "revise," Colorquick proposes the alternate construction "change or modify."  Kodak proposes "using the recorded information about the modification of the image display of the still image proxy to automatically modify one or more instructions in the PDL image file, such that the appearance of the electronic document when printed will be identical to the modified appearance of the image display of the still image proxy." The parties' disputes center on whether or not the PDL image file must be automatically modified after manipulation, and also whether or not the manipulated still image proxy must be identical to the modified PDL image file.

At the *Markman* hearing, the Court proposed the following language as part of the construction: "using the information about the manipulations to revise the PDL image file with automated software."  Colorquick agreed to the Court's proposal, so long as the "revise ... with automated software" language in the proposed construction does not mean the revision must automatically and instantaneously occur, and the language does not exclude other types of revisions made with the use of human intervention.  Kodak agreed to language "revise ... with automated software" instead of its originally proposed "automatically modify" language, but maintained its position that the PDL image file must be automatically modified after manipulation, and that the

manipulated still image proxy must be identical to the modified PDL image file.  After careful consideration of the parties' arguments, the Court finds the phrase requires construction.  However, the parties' initial proposals either find insufficient support in the patent, or are ambiguous and overly broad.  As the Court's construction, the Court adopts: "using the information about the manipulations to revise the PDL image file with automated software so as to match the PDL image file to the manipulations made to the image display of the still image proxy."  For the reasons that follow, the Court's construction is a rejection of Kodak's proposed limitations that the PDL image file must be automatically modified during the revision process, and that the printed document must be identical to the graphic on the image display.

### 1.      "Automatically modify"

Kodak argues the primary basis for the patentee distinguishing the invention over the prior art was a high level of automation.  Based on this high level of automation discussed in the specification, Kodak argues the specification teaches an automatic revision process, and cites Federal Circuit precedent to support its argument that the revision process occurs automatically.  First, Kodak argues the specification distinguishes the invention over the prior art by noting that under prior art preflight processes, "manual intervention was required to address the problem" when the submitted document did not match the space for the printed version of the document.  *See* '149 patent col. 1:45-61.  Kodak also points to two other portions of the specification which it argues describe the invention's novelty as eliminating any manual revisions through a highly automated revision process.  *See* '149 patent col. 2:29-33 ("As the printing industry moves towards automating customer interactions, additional tools are needed so that customers can more easily interact with their printing jobs within an automated environment when changes must be made to their files");

'149 patent col. 5:62-6:7 (noting that when a sizing error occurs, "[o]ne option is similar to the conventional ColorQuick preflight process described above which ... requires manual intervention by the customer.  Another option in accordance with the present invention is to select an automated process called QuickFit . . . If the user selects QuickFit, no manual intervention is required to address the sizing problem").  Based on these portions of the specification, Kodak cites two Federal Circuit decisions to support its "automatically modify" limitation.  In the first case, the Federal Circuit concluded a process discussed in the patent was automatic based primarily on a high level of automation discussed in the specification.  *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1313 (Fed. Cir. 2007).  In the other case, *Honeywell Int'l*, the Court upheld a ruling that the embodiment discussed in the specification was the sole embodiment (and therefore limiting) since it was referred to multiple times as "the present invention" or "this invention."  Based on *Honeywell Int'l* and *Ormco*, Kodak argues the use of language such as "the present invention" when referencing embodiments describing a high level of automation effectively limits the '149 patent to an automatic revision process.  Ultimately, however, all of Kodak's arguments for its "automatically modify" limitation are unpersuasive, and the are the cited cases are distinguishable in this instance.

The specification sections Kodak argues support its proposed "automatically modify" limitation do suggest the revision process described in the patent is largely automated.  However, an automated process does not necessarily mean the claims are limited such that the PDL image file must be modified automatically upon manipulation of the image display.  The language cited by Kodak, specifically the portions discussing how "no manual intervention *is required*," and how the process occurs "*within an automated environment*," note what is within the scope of invention without necessarily limiting the scope.  Neither passage specifically indicates the modification of the

PDL image file must occur automatically, or that all manual interventions are outside the scope of the process.  While it does appear from the specification that the patentee was trying to distinguish certain prior art by noting the invention offers a more automated process instead of requiring a "manual intervention,"[11] ultimately neither the claims nor the specification use the term "automatic" or "automatically" to describe the revisions.[12]  It should also be noted that of the two passages of the specification cited above, one is describing a single embodiment of the invention, while the other passage describes one of the many figures in the patent.[13]  The Court must not limit the claims based on the description of a single embodiment, and there is no other indication the invention requires the modifications to automatically occur.

As for the two cases Kodak cites, both are distinguishable.  In *Ormco*, the Federal Circuit upheld a claim construction reading an "automatic" limitation into the patent's claims because "it [was] clear that the inventors' primary basis for distinguishing their invention was its high level of automation ... as compared to the prior art."  *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1313 (Fed. Cir. 2007).  Kodak argues the same reasoning holds true for the '149 patent.  While the '149

---

[11]

An example of a "manual intervention" could be something as simple as clicking a mouse to initiate the revision procedure after the manipulations are made.  A process can be largely automated and still require minimal human interventions such as clicking a mouse.

[12]

Had the patentee or examiner intended to limit the claims to automatic revision of the PDL image file, the term "automatically" could have been used in any number of areas to describe the revision process.  Indeed, Colorquick points to Fig. 8, which uses the term "automatically" to describe a different conversion, as evidence that the patentee used "automatically" when it was intended.  '149 patent fig. 8.  Ultimately, "automatically" is not used anywhere to describe the process, and Kodak's proposed limitation is without sufficient support.

[13]

After describing how "manual intervention is required to address the sizing problem" if the QuickFit option is selected, the second passage describing Fig. 6 goes on to state "the manipulations are delivered back to the service bureau, and the service bureau *uses automated software to revise* the original image file based on the manipulations." '149 patent col. 6:1-7 (emphasis added).  The "uses automated software to revise" tracks the Court's construction, and also does not indicate the revisions are automatic.

24

patent does discuss an automated process as part of its novelty, Kodak's proposed construction goes too far in limiting the claims.  The '149 patent does not explicitly exclude all human interaction (such as clicking a mouse) in the process of modifying the PDL image file, and does not indicate the process must be "automatic."

The second case Kodak cites, *Honeywell Int'l*, is also unavailing.  In *Honeywell Int'l*, the Federal Circuit upheld a ruling limiting the claim term "fuel injection system component" to a fuel filter because the specification referred to the fuel filter as "this invention" or "the present invention" at least four times, and no other parts were described.  *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316-18 (Fed. Cir. 2006).  Based on the Federal Circuit's statement that "[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter," Kodak cites language throughout the specification where "the present invention" or "an important feature of the present invention" is used to describe various embodiments, and argues *Honeywell Int'l* stands for the proposition that the patent should be limited to whatever is referenced when such statements are made.  The Court has already discussed herein the difficulties with reading *Honeywell Int'l* to limit the claims solely because the patent uses language such as "the present invention" when describing embodiments.  *See supra* note 8.  In *Honeywell Int'l*, the Federal Circuit found the specification was describing the *sole* embodiment rather than a preferred embodiment when it used "the present invention" or similar language.  In every instance Kodak has pointed to such language in the '149 patent, the language is describing individual features of the invention without limiting the claims to those features.  For example, in this instance Kodak is arguing one sentence early in the specification stating "[a]nother process *in accordance with the present invention* is to select an automated process called QuickFit" is somehow support for its proposed limitation that the PDL

image file must be "automatically modif[ied]." '149 patent col. 5:63-6:1 (emphasis added). However, the automated process described in the passage, QuickFit, is not the limit of the invention. Read in full context, the passage Kodak cites is describing another option over the prior art, and a single embodiment of the invention.  While the passage may support an argument that the process is generally automated, it does not indicate the claims are limited to automatic modification of the PDL image file, nor does it eliminate human intervention in the process.[14]

The parties largely agreed at the *Markman* hearing to including the "revise the PDL image file with automated software" language, and after examination of the intrinsic evidence, the Court finds such language is appropriate and necessary.  However, in accordance with the discussion herein, the Court rejects Kodak's proposed "automatically modify" limitation as an attempt to import a limitation into the claims.  Therefore, in adopting the language "revise ... with automated software," the Court notes that "automated software" is not synonymous with an "automatic" revision process.

### 2.        "Identical to the modified appearance of the image display..."

The second portion of Kodak's proposed construction, stating "the appearance of the electronic document when printed will be *identical* to the modified appearance of the image display of the still image proxy," also improperly adds a limitation into the claims.  Kodak argues its proposal that the printed document must be "identical" to the modified image display is based on the

---

[14]

While Kodak cites *Honeywell Int'l* multiple times to support arguments that the "present invention" language in the specification is meant to limit the invention, it appears to ignore such language in certain instances.  For example, Kodak argued that the patent claims do not cover appending production specifications as part of the electronic manipulation, but ignored that the specification states "*another feature of the present invention* is that production specifications may be electronically appended to the image display of the still image proxy." '149 patent col. 8:11-14 (emphasis added).

claim language, specifically the language discussing "using the information about the manipulations to revise the PDL image file so as to *match* the PDL image file to the manipulations made to the image display of the still image proxy." '149 patent col. 11:57-59 (emphasis added).  Kodak also relies heavily on two passages of the specification.  '149 patent col. 8:48-51 ("The production server uses the physical manipulations ... to modify the original PDL-defined image *in a manner identical to* the modifications made to the still image proxy") (emphasis added); '149 patent col. 7:30-34 ("An important feature of the present invention is that this process allows the user to view *exactly* how the ad will appear within the purchased ad space") (emphasis added).[15]  Finally, Kodak also points to the applicant's "Petition to Make Special For New Applicant" in the prosecution history, which highlighted the step of "using the information about the manipulations to revise the PDL image file so as to match the PDL image file to the manipulations made to the still image format proxy" as the feature of the invention not disclosed or suggested in the prior art references.  *See* Petition to Make Special For New Application Under MPEP § 708.02. VIII at 3 (Mar. 21, 2002); (Doc. No. 55, Ex. K).

While the claims call for revising the PDL image file to "match" the manipulations made to the image display of the still image proxy, saying the PDL image file must be "identical to the modified appearance of the image display of the still image proxy" overly limits the claim.  The only portion of the patent Kodak presented that includes the term "identical" discusses only that the

---

[15]  Kodak again argues that the *Honeywell Int'l* case stands for the proposition that the specification language noting that "*[a]n important feature of the present invention* is that this process allows the user to view *exactly* how the ad will appear within the purchased ad space" limits the invention.  *See* '149 patent col. 7:30-34 (emphasis added). However, as discussed *supra*, the Court is unpersuaded by Kodak's interpretation of *Honeywell*, and as discussed *infra*, the full context of the intrinsic evidence does not support limiting the claims in the manner Kodak suggests.

modifications made to the PDL image file must be made in a "manner identical" to the modifications of the image display of the still image proxy.  In other words, the specification discusses that the manner of making the modifications are identical, not that the actual printed document will necessarily be identical to the manipulated image display.  Using the word "identical" implies a level of perfect correlation that is not necessarily always possible between an image on a screen and a printed document.  For example, a display screen may present the same image as the printed document, but may simply be too small to present the image to the exact dimensions at which it is printed, and would therefore not fit within Kodak's proposed language.  While the specification states the "process allows the user to view *exactly* how the ad will appear within the purchased ad space," it also specifically states the image display graphic is designed for maximum viewability on the screen without regard to the size of the printed document.  *See* '149 patent col. 5:12-17 ("The template is sized so as to appear as large as possible within the application program, regardless of the actual predetermined area in which the electronic document must fit.  This provides for maximum viewability...").  Kodak's proposal would read out this portion of the specification since the size of the image on the display screen would not be "identical" to the size of the printed document.[16]

Finally, with regard to the "Petition To Make Special," the applicant may have been pointing to the step of "match[ing]" the PDL image file to the manipulations of the image display as the novel

---

[16]
     Colorquick also argues the patent discloses a step whereby crop marks are removed if they are not needed after the user manipulations are effectively complete.  *See* '149 patent col. 9:7-15 ("In this step, crop marks are removed if they are not needed in the electronic ad file (i.e., the revised PDL image file).  Removing crop marks too early may prevent the preflight software from determining the exact page size.  By waiting until after the user-driven manipulations are done and preflighted, additional manipulations performed at this point do not affect the preflight report that the user sees").  Colorquick argues the presence of the crop marks on the display may not reflect the printed document, meaning Kodak's proposal could read out other portions of the process discussed in the specification as well.

step, but it does not imply the printed document and manipulated image display  must be identical for the invention to be novel.  As noted, the Court finds the term "identical" to be overly limiting in the full context of the intrinsic evidence.  Ultimately, there is no indication in the claims or the specification that "the appearance of the electronic document when printed will be identical to the modified appearance of the image display of the still image proxy."

Having rejected Kodak's proposed limitations, and considering and incorporating the parties' arguments and agreements, the Court adopts as the final construction: "using the information about the manipulations to revise the PDL image file with automated software so as to match the PDL image file to the manipulations made to the image display of the still image proxy."[17]

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above.  For ease of reference, the Court's claim interpretations are set forth in a table attached to this opinion as Appendix A.

**So ORDERED and SIGNED this 25th day of June, 2008.**



JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

---

17

While the Court's construction largely tracks the claim language, the "with automated software" language is supported by the specification, and does clarify the process is automated to some degree without going so far as saying the revision is automatic.  With the exception of noting the automated nature of the process, there is no better way to phrase the process than the claim language has already done.

# APPENDIX A

# DISPUTED TERMS

| CLAIM TERM | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|---|
| **Still Image Proxy** | a substitute still image file, which may be a JPEG, GIF, and PNG file, or the like. | A computer file, such as a JPEG, GIF, PNG, or the like, that substitutes for the PDL image file and specifies the appearance of the electronic document when presented on a display screen. | a still computer file, such as a JPEG, GIF, PNG or the like, that substitutes for the PDL image file |
| **Static Template** | *No construction necessary.*<br><br>*Alternative construction:* a template that defines a predetermined area for an image display of a still image proxy. | A fixed frame presented on the display screen that corresponds to a predetermined area in which the electronic document must fit when printed, and in relation to which the image display of the still image proxy is manipulated. | a template shown on a display screen that when set corresponds to a predetermined area in which the electronic document must fit, and is displayed in association with the image display of the still image proxy. |
| **Electronically Manipulating** | *No construction necessary.*<br><br>*Alternative construction:* managing, using or altering by electronic means. | Use of a computer program to modify the appearance of the image display of the still image proxy relative to the static template to reflect the desired appearance of the electronic document when printed. | electronically modifying the appearance of the image display of the still image proxy, or electronically appending production specifications. |

| Using the information about the manipulations to revise the PDL image file so as to match the PDL image file to the manipulations made to the image display of the still image proxy | *No construction necessary.*<br><br>*Alternative construction for term "revise":* change or modify. | Using recorded information about the modification of the image display of the still image proxy to automatically modify one or more instruction in the PDL image file, such that the appearance of the electronic document when printed will be identical to the modified appearance of the image display of the still image proxy. | using the information about the manipulations to revise the PDL image file with automated software so as to match the PDL image file to the manipulations made to the image display of the still image proxy. |

**AGREED TERMS**

| CLAIM TERM | AGREED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|
| **Image Display** | a visual representation shown on a display screen. | a visual representation shown on a display screen. |
| **PDL Image File** | a computer file containing page description language (PDL) code that defines the appearance of an electronic document when printed. | a computer file containing page description language (PDL) code that defines the appearance of an electronic document when printed. |

31